UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

HATHAWAY HOMES, PHASE II
LIMITED PARTNERSHIP, ET AL.,

        Plaintiffs,

                                  CASE No. 1:22-cv-23

v.

                                  HON. ROBERT J. JONKER

NATURA ARCHITECTURAL
CONSULTING, LLC,

        Defendant.

Type text here _____ /

## OPINION AND ORDER

### INTRODUCTION

Hathaway Homes Phase II Limited Partnership, and its developer, S.E. Clark & Associates, Inc., planned to build twelve low-income housing units on property in Pana, Illinois. The project anticipated tax credits from the State of Illinois. One requirement to qualify for the tax credits was a clean Phase I Environmental Site Assessment of the property. S.E. Clark contracted with Natura Architectural Consulting, LLC to perform the assessment. The written contract required Natura to do the work consistent with the EPA's All Appropriate Inquiries (AAI) regulations and the American Society for Testing and Materials (ASTM)'s Standard Practice for Environmental Site Assessments. The price quoted for the initial assessment was $2,100.

Natura completed three total Phase I ESAs for S.E. Clark, all with similar contract terms and pricing. None of the ESAs identified any red flags known as Recognized Environmental Conditions (RECs). This opened the door to the tax credits. Hathaway Homes purchased the property and began work. Contractors found construction debris and other items—including

asbestos containing materials—on the job site soon after excavation began.  Hathaway Homes and S.E. Clark considered various remediation options, but ultimately decided not to proceed with the development.  Hathaway Homes and S.E. Clark filed this diversity action against Natura for breach of contract, negligence, and negligent misrepresentation.

Both sides move for summary judgment.  Plaintiffs seek summary judgment in their favor on all three counts.  Natura says the contract claim needs to proceed to trial, but it seeks summary judgment dismissing the two tort claims.  For the reasons that follow, the Court denies Plaintiffs' motion and grants Natura's motion.  With respect to the two tort claims, the Court determines Michigan would apply the economic loss doctrine to professional services contracts involving environmental consultants providing a commodity service like a Phase I ESA.  Plaintiffs have also failed to demonstrate a violation of a legal duty separate and distinct from the contractual obligations in this case, or a genuine issue of material fact on the negligent misrepresentation claim.  The case will therefore proceed to trial on only the contract claim.

## FACTUAL BACKGROUND

### 1.  *The Prospective Development and Phase I ESAs*

Sometime before the fall of 2018, Hathaway Homes became interested in developing property in Pana, Illinois, for twelve low-income housing units.[1]  The location of the planned development was 101 North Hickory Street, Pana IL ("Hickory Property").

Hathaway Homes, the prospective purchaser, hired S.E. Clark to be a "turnkey" developer.  (Bell Dep. 15, 29-30, ECF No. 72-2, PageID.2303, 2307-2308).  In this, the company appears to

---

[1] Hathaway Homes is comprised of a general partner and a limited partner.  Wincopin Circle LLLP and then Enterprise Neighborhood Impact Fund II, LLC were the limited partners during the events of this case.  The two entities were originally named plaintiffs; they have since been dismissed on Hathaway Homes' unopposed motion.  (ECF No. 89).

have been responsible for most of the advance work, including finding tax credits for the project. So, before Hathaway Homes purchased the property, S.E. Clark applied for credits through the Illinois Housing Development Authority ("IHDA").  A required part of the low-income housing tax credit (LIHTC) application was a Phase I ESA.

Phase I ESAs are a common form of environmental due diligence that investigates historic uses of a commercial property to determine whether there is, or likely is, environmental contamination.  Kristine Bersche (a Natura Employee and an environmental professional) testified that Phase I ESAs are an EPA standard part of the due diligence process for commercial real estate transactions.  (Bersche Dep. 16, ECF No. 70-3, PageID.2159).  One of the purposes of a Phase I ESA is to identify "Recognized Environmental Conditions" or RECs.  (Bersche Dep. 91, ECF No. 70-3, PageID.2167).  In layman's terms, RECs are red flags concerning the presence or likely presence of hazardous materials on a property.

Industry standards provide guidance for completing Phase I ESAs, including direction on who should complete the Phase I ESAs, and what types of sources should be consulted.  The two standards at issue in this case are the United States Environmental Protection Agency's (USEPA) Standards and Practices for All Appropriate Inquiries (AAI), found at 40 CFR Part 312 and the guidelines established by the American Society for Testing and Materials (ASTM) in the *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process I Designation E 1527-13* (ASTM Standard Practice E 1527-13).  The parties do not completely agree on how the AAI and the ASTM relate, but they appear to agree that compliance with the ASTM will also comply with the AAI.  Natura seems to believe that an ASTM-compliant assessment is not the only way to comply with the AAI.  But the Court need not delve too deep into this because both sides focus in their briefing on the ASTM.

### 2.   *S.E. Clark Switches Its Business to Natura for a Phase I ESA of the Hickory Property*

S.E. Clark hired Natura to perform the Phase I ESA of the Hickory Property in the fall of 2018 after S.E. Clark's then-Vice President, Nathan Joseph, met Natura's President, Nathan Gillette, at a New Orleans conference.  (Gillette Dep. 22, ECF No. 52-9, PageID.1382).

At the time, S.E. Clark was looking for a new consultant to perform due diligence reviews for the company.  The previous consultant S.E. Clark had engaged to do Phase I ESAs had grown more expensive.  Furthermore, the executive Mr. Joseph had previously worked closely with had moved into a management role and was not as communicative as he had previously been.   After speaking with Mr. Gillette, Mr. Joseph believed Natura would provide the better price and access S.E. Clark wanted: "So our conversation with Nate Gillette was, wow, that's great.  Sounds like you're more affordable.  Sounds like you're our go to guy and we don't have to go through a chain of bureaucracy to get you, you're doing the work."  (Joseph Dep. 29-30, ECF No. 70-4, PageID.2173-2174).

### 3.   *The Parties Contract for a Phase I ESA*

On December 12, 2018, S.E. Clark contracted with Natura for a Phase I ESA at the Hickory Property (the "2018 NAC proposal" or the "initial proposal").  (ECF No. 70-2).  The total cost for the Phase I ESA at the Hickory Property was quoted at $2,100.  (ECF No. 70-2, PageID.2149).[2]

Natura made several representations in the nine-page proposal.  The Phase I ESA, Natura stated:

> will be conducted in general accordance with (1) the United States Environmental Protection Agency (USEPA) Standards and Practices for All Appropriate Inquiries {(AAI), 40 CFR Part 312} and (2) guidelines established by the American Society for Testing

---

[2] The 2018 Natura Proposal contemplated a Phase I ESA at two locations in Christian County, Illinois, one being the Hickory Property.  The Phase I ESA for the other location does not appear to be an issue in this lawsuit.

> and Materials (ASTM) in the *Standard Practice for Environmental Site Assessments: Phase I Environmental Site Assessment Process I Designation E 1527-13* (ASTM Standard Practice E 1527-13).

(ECF No. 70-2, PageID.2148).

Natura's proposal also contemplated the scope of work to be performed:

> The purpose of the Phase I ESA is to gather sufficient information to develop an independent professional opinion about the environmental condition of the subject property. The ESA will be conducted in an attempt to satisfy the ASTM [American Society for Testing and Materials] Standard (E-1527-13) and the U.S. EPA Standards and Practices for All Appropriate Inquiry as defined in the Small Business Liability Relief and Brownfields Revitalization Act.

(ECF No. 70-2, PageID.2149).

The proposal further detailed that the Phase I ESA would encompass records reviews; site reconnaissance; interviews with owners and occupants; and interviews with local government officials. All of these are requirements of the ASTM. The proposal concluded by providing a boilerplate list of Terms and Conditions including those covering performance (Para. 2); indemnity (Para. 5); limitation of liability (Para. 7); and a zipper clause (Para. 9). (ECF No. 70-2, PageID.2152). The limitation on liability provision reads:

> **7. LIMITATION OF LIABILITY**: In recognition of the relative risks, rewards and benefits of the project to both the Client and NAC [Natura], the risks have been allocated such that the Client agrees, to the fullest extent permitted by law, **TO LIMIT NAC'S LIABILITY TO THE CLIENT AND TO ALL THE CLIENT'S CONTRACTORS AND SUBCONTRACTORS ON THE PROJECT FOR ANY AND ALL CLAIMS, LOSSES, COSTS, DAMAGES , OR CLAIMS EXPENSES FROM ANY CAUSE OR CAUSES, SO THAT THE TOTAL AGGREGATE LIABILITY OF NAC TO ALL THOSE NAMED SHALL NOT EXCEED NAC'S TOTAL FEE FOR SERVICES RENDERED ON THIS PROJECT.** Such causes include, but are not limited to, negligence, professional errors or omissions, strict liability, and breach of contract or warranty.

5

(ECF No. 70-2, PageID.2152).

### 4.  *The First Phase I ESA*

Natura completed its Phase I ESA on February 13, 2019.  (ECF No. 72-9).  The completed assessment contained a cover letter addressed to S.E. Clark signed by Bryan Hengst, Natura's environmental professional at the time.[3]  The cover letter recited that the Phase I ESA was conducted in accordance with the AAI, the ASTM, and IHDA standards.  (ECF No. 72-9, PageID.2433).

In addition to the cover letter, the Phase I ESA for the Hickory Property contained an executive summary.  The bottom line was that the review revealed no evidence of RECs at the property.  The executive summary was signed both by Mr. Hengst and by Mr. Gillette, as follows:

---

[3] The ATSM standards require that a Phase I ESA must be prepared by an environmental professional.  *See* ATSM Standards § 4.3 ("A *Phase I Environmental Site Assessment* must be performed by an *environmental professional* as specified in Section 7.5.1. No practical standard can be designed to eliminate the role of judgment and the value and need for experience in the party performing the inquiry.  The professional judgment of an *environmental professional* is, consequently, vital to the performance of *all appropriate inquiries*.").

The definition of an environmental professional appears to be found in an appendix to the ASTM, and also in the CFR at 40 C.F.R. 312.10.  Among other things, an environmental professional is someone who "possesses sufficient specific education, training and experience necessary to exercise professional judgment to develop opinions and conclusions regarding conditions indicative of releases or threatened releases of [hazardous substances as defined in CERCLA] on, at, in, or to a property[.]   Licensure combined with years of experience is one way someone can be an environmental professional, but it is also sufficient if one has sufficient experience alone (10 years).  *See* 40 C.F.R. 312.10(b)(2)(i)-(iv); *see also* ASTM Standard Practice E 1527-13 app. X2.1.1(2).  A person who does not qualify as an environmental professional may assist in the conduct of all appropriate inquires if such person is under the supervision or responsible charge of a person meeting the definition of an environmental professional provided above when conducting such inquires.  ASTM Standard Practice E 1527-13 app. X2.1.1(5).

**Recommendations**

We have performed a Phase I Environmental Site Assessment in conformance with the scope and limitations of ASTM Practice E 1527-13 of the Undeveloped Land located at 101 North Hickory Street in Pana, Christian County, Illinois, the subject property.  Any exceptions to, or deletions from, this practice are described in Section 1.4 of this report.  This assessment has revealed no evidence of recognized environmental conditions connected with the property.  Therefore, no further investigation is recommended at this time.

The summary presented above is general in nature and should not be considered apart from the entire text of the report, which contains the qualifications, considerations and subject property details mentioned herein.  Details of findings and conclusions are elaborated upon in this report.

This report has been reviewed for its completeness and accuracy.  Please feel free to contact our office at 616.431.4772 to discuss this report.

| REPORT PREPARED BY: | REPORT REVIEWED BY: |
|---|---|
| Natura Architectural Consulting, LLC | Natura Architectural Consulting, LLC |
| Bryant Hengst | Nathan M. Gillette, AIA, LEED-AP O+M, CEM |
| Project Manager / Environmental Professional | President |

(ECF No. 72-9, PageID.2436).

Mr. Joseph reviewed the executive summary and skimmed the rest of the report.  (Joseph Dep. 81, ECF No. 72-4, PageID.2356).  He noted that Natura found no RECs and he knew that this was what the IHDA would be looking for.  (*Id.*).  Mr. Joseph sent the report to Hathaway Homes' general and limited partners.  (Joseph Dep. 84-85, ECF No. 72-4, PageID.2358-2359). He did not have any discussions with anyone about the substance of the report.  (Joseph Dep. 85, ECF No. 72-4, PageID.2359).

###### 5. *The Second Contract and Additional Phase I ESAs*

The financing application was eventually approved to move to the next step.  (Joseph Dep. 89-90, ECF No. 72-4, PageID.2361).  S.E. Clark contacted Natura for an updated Phase I ESA.[4]

---

[4] As set out in the First ESA, ASTM standard practice is that the client could not rely on an ESA after 180 days from the report.  First ESA § 1.4, ECF No. 72-9, PageID.2440 (citing ASTM Standard Practice E 1527-13).

And on October 29, 2019, the parties agreed to terms substantially similar to the original ones, including the standard commercial terms and conditions.  This time, the damage limit was capped by Natura's E&O coverages, rather than its fees.  (ECF No. 72-11).  The contract price for the second Phase I ESA was half the cost of the original Phase I ESA -- $1,100.00.  It closely parallels the 2018 proposal in terms of setting out the scope of the Phase I ESA.

The second Phase I ESA was prepared by a different environmental professional, Kristine Bersche.  At the time, Ms. Bersche was a new hire of Natura, but she had a degree in environmental policy and approximately twenty years of experience.  (Bersche Dep. 17, ECF No. 70-3, PageID.2159).  Over her career, she had performed over a thousand Phase I ESAs.  (*Id.*).  Ms. Bersche testified she was conservative in her approach to completing Phase I ESAs.  If she had a concern about a potential REC she would identify it, because that is the point of Phase I ESAs.  (Bersche Dep. 90-91, ECF No. 70-3, PageID.2167).

Ms. Bersche testified she started over for the second Phase I ESA at the Hickory Property.  (Bersche Dep. 48, ECF No. 76-2, PageID.2585).  That is, she did not simply update the previous assessment.  To complete the assessment, Ms. Bersche used a third-party database search engine, ERIS, to gather the various documents required for the Phase I ESA.  (Bersche Dep. 78, ECF No. 76-2, PageID.2598).  Ms. Bersche also reviewed other materials and sent inquiries to state and local departments.

The second Phase I ESA was completed on December 13, 2019.  (ECF No. 70-7).  Like the first Phase I ESA, the executive summary described that the assessment revealed no evidence of RECs at the Hickory Property.  The summary concluded with the same language that the report had been reviewed for completeness and accuracy, and it ended with the signatures of Ms. Bersche

8

and Mr. Gillette, as well as the similar "prepared by" and "reviewed by" language as in the first ESA.

A third and final Phase I ESA was prepared by Ms. Bersche and sent to S.E. Clark on January 14, 2020.  (ECF No. 62-2, PageID.1479-1507).  The executive summary signature block was identical to that of the second Phase I signature block.  (ECF No. 62-2, PageID.1482).

### 6.  *Plaintiffs Purchase the Hickory Property and Excavation is Halted After Asbestos is Discovered.*

Hathaway Homes acquired the Hickory Property on January 29, 2020.  Ms. Bell, the CEO of Hathaway Homes, avers Hathaway Homes did so in reliance on the three Phase I ESAs that Natura prepared indicating there were no RECs at the Hickory Property.  (Bell Decl. ¶ 2, ECF No. 70-8, PageID.2230).

On April 9, 2020, the excavation contractor, Clancy Coleman Excavating, discovered a buried foundation and construction debris on the Hickory Property.  (Coleman Dep. 23, ECF No. 76-8, PageID.2670).  When pricing out the additional cost of removing the foundation and debris, Mr. Coleman told Plaintiffs the price would increase if hazardous materials were found.  (ECF No. 76-8, PageID.2676).  In the meantime, Mr. Coleman arranged with his cousin to place some of the excavated material at a separate site (the "Coleman property").  (Coleman Dep. 44, ECF No. 76-8, PageID.2675).

A few months later, the Christian County Solid Waste Department received a complaint about dust being generated at the Hickory Property.  The Hickory Property was inspected on June 3, 2020.  Once there, department inspectors saw transite panels, which contain asbestos, at both the Hickory and Coleman properties.  (ECF No. 62-5, PageID.1924).  Further work at the Hickory Property was halted.

### 7. *Violations and Remediation Work*

On July 31, 2020, Plaintiffs were served with Violation Notices (VNs) from the Illinois Environmental Protection Agency (IEPA).  (ECF No. 62-5, PageID.1919).  Plaintiffs then entered into Compliance Commitments with the IEPA under which Plaintiffs agreed to remediate the violations at the Hickory and Coleman properties.  (ECF No. 62-6, PageID.1968).

Initially it appeared that work on the property could continue.  For example, Mr. Joseph testified Ms. Bersche sent an email on June 11, 2020, stating that it did not seem like a huge remediation project.  (Joseph Dep. 145, ECF No. 70-4, PageID.2184).   But at some point, the conversation turned to capping the site and walking away from the Hickory Property due to increased construction costs.  (Joseph Dep. 150, ECF No. 70-4, PageID.2185).  Ultimately the excavation work was stopped and the site at the Hickory Property was capped.  Plaintiffs sold the Hickory Property on August 16, 2021.

## PROCEDURAL HISTORY

Plaintiffs brought this diversity action on January 7, 2022.  (ECF No. 1).  The original complaint alleged Breach of Contract and a single claim of negligence / professional malpractice. (ECF No. 1).  Plaintiffs then moved for leave to amend their complaint to add a second tort theory, namely, a negligent misrepresentation claim alleging that as a lay person, Natura's president (Mr. Gillette) was not competent to review the Phase I ESAs for completeness and accuracy as he had allegedly represented.  The Court granted the motion to amend (ECF No. 61), and the operative pleading is at ECF No. 62.

Plaintiffs (ECF No. 69) and Natura (ECF No. 71) filed motions for summary judgment. Plaintiffs seek summary judgment in their favor on all three counts.  Natura seeks summary judgment dismissing the two tort claims and opposes Plaintiffs' motion on the contract theory.

Each side cites expert testimony to support its position, and each side seeks to strike portions of the other side's expert opinion.  (ECF Nos. 78 and 82).  The Court heard argument on the summary judgment motions on April 12, 2023, and thereafter took them under advisement.  The motions are ready for decision.

## LEGAL STANDARDS

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Material facts are facts which are defined by substantive law and are necessary to apply the law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."  *Id.* at 252.  In deciding a motion for summary judgment, the court must draw all inferences in a light most favorable to the non-moving party but may grant summary judgment when "'the record taken as a whole could not lead a rational trier of fact to find for the non-moving party.'"  *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

When cross motions for summary judgment are filed, the court must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration."  *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (quoting *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391).  "[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is 'higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury

would be free to disbelieve it.'" *Cockrel v. Shelby Cnty. Sch. Dist.*, 280 F.3d 1036, 1056 (6th Cir. 2001) (quoting *Moore's Federal Practice*).

## DISCUSSION

The factual recitals of the parties are dense and rooted in detailed industry and regulatory standards. The legal claims themselves, however, are relatively straightforward. For the reasons that follow, the Court determines that the breach of contract claim must proceed to trial, but Natura is entitled to summary judgment dismissing the two tort claims.

### 1. *Breach of Contract*

Plaintiffs' first claim is for breach of contract. Plaintiffs complain that all Natura did to complete the Phase I ESAs is search a third-party vendor database and send letters out into the ether without ever following up. There's nothing wrong using a third-party database, Plaintiffs say, but the AAI, the ASTM, and the contract terms overall require more than merely checking a box or boxes. Yet Plaintiffs say that's all they got, and they specifically identify four ways in which Natura's Phase I ESAs allegedly fell short of the industry standards specified in the contract. Natura says there are, at a minimum, genuine issues of material fact for a jury. The Court agrees with Natura.

To establish a claim for breach of contract under Michigan law,[5] a plaintiff must prove by a preponderance of the evidence the following: "1) the existence of a contract between the parties; 2) the terms of the contract; 3) that defendant breached the contract; 4) that the breach caused the plaintiff injury." *Timmis v. Sulzer Intermedics, Inc.*, 157 F. Supp. 2d 775, 777 (E.D. Mich. 2001) (citing *Webster v. Edward D. Jones & Co., L.P.*, 197 F.3d 815, 819 (6th Cir. 1999)). Where "the contractual language is unambiguous, a court must interpret and enforce the contract as written,

---

[5] This is a diversity case, and both sides agree Michigan law applies here.

because an unambiguous contract reflects the parties' intent as a matter of law." *In re Smith Trust*, 480 Mich. 19, 745 N.W.2d 754, 758 (2008) (citing *Frankenmuth Mut. Ins. Co. v. Masters*, 460 Mich. 105, 595 N.W.2d 832, 837 (1999)).   A breach is a violation or infraction of an obligation by failing to perform one's own contractual promise, by repudiating the promise, or by interfering with another party's performance. *Breach of Contract*, Black's Law Dictionary (8th ed. 2007).

### A.   The Contract and Its Terms

Both sides agree that there was a written contract between the parties.  They also mostly agree about the terms of the contract.  The parties' one dispute over the meaning of the contractual terms is whether the statements at various points in the Natura Proposals that Natura "is typically exhaustive" is a binding term or whether the statement is merely aspirational.  The Court is satisfied that it is the latter.  Plaintiffs are not pursuing a fraudulent inducement claim based on this language.[6]  And the use of the word "typically" makes clear that in context, these are boasting statements of opinion or intention, and not a contractual undertaking.  *C.f.* Restatement (Second) of Contracts § 2 cmt. (f) (1981) (distinguishing promises from opinions and predictions); *see also id.* at § 1 ("A contract is a promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.").   Accordingly, Plaintiffs cannot establish a breach based on this language contained in the Natura proposals.

### B.   Breach

But even putting this phrasing to one side, Plaintiffs claim Natura violated other enforceable terms in four separate ways: 1) failing to conduct sufficient research of historical documents related to properties surrounding the Hickory Property; 2) failing to review IEPA

---

[6] *See In re Swantek Estate*, 172 Mich. App. 509, 513 (1988) (setting out the elements of a fraudulent misrepresentation claim).

regulatory files; 3) failing to interview local regulatory officials; and 4) failing to recognize the possible use of pesticides and underground storage tanks as possible RECs in accordance with the ASTM.  Natura contends there are outstanding questions of fact that preclude summary judgment on all these theories.  The Court agrees.

<em>i.      Research and IEPA files</em>

The ASTM sets out four components of a Phase I ESA: 1) Records review; 2) Site Reconnaissance; 3) Interviews with past and present owners; and 4) interviews with local government officials.  (Phase I Environmental Site Assessment, *Four Components*, ASTM Standards § 7.2).  Plaintiffs' first two theories of breach relate to the first component.

Plaintiffs' arguments raise the question of whether Natura could comply with the AAI and ASTM by using a third-party vendor.  The basic claim here is that to comply with the requirements of the AAI and ASTM, Natura had to perform additional historical research beyond consulting a database.  Such research, Plaintiffs claim, would have revealed a court order (the Rose Order) about historical illegal dumping on an adjoining property to the North of the Hickory property.  More specifically, Plaintiffs assert that had Natura dug into the records a bit more, it would have discovered the Hickory Property and the adjoining property used to have the same owner, thus the dumping on the northern property likely should have alerted Natura to the risk that the Hickory Property suffered from the same problems.  And Plaintiffs' expert, Mr. Pisarik, opines that with this information in hand, Natura's environmental professional would have (after various steps) identified asbestos containing materials as an REC at the Hickory Property.  Natura disputes whether the Rose Order was a record that would have come up in the ordinary course of an ASTM compliant assessment.  This dispute cannot be resolved as a matter of law.

Records reviews are discussed in Section 8 of the ASTM.  The objective is to "obtain and review records that will help identify [RECs]"  (Records Review, *Objective* ASTM Standards § 8.1.1).  The ASTM goes on to state that certain "standard environmental record sources shall be reviewed."   This includes state lists of hazardous waste sites identified for investigation or remediation.  (Records Review, *Environmental Information*, ASTM Standards § 8.2.1).  If the subject property, or any adjoining property is "identified on one of the standard environmental record sources . . . pertinent regulatory files and/or records associated with the listing should be reviewed[.]" (Records Review, *Regulatory Agency File and Records Review*, ASTM Standards § 8.2.2.1).  Section 8 then goes beyond the standard sources in Section 8.2.1 to provide that "to enhance and supplement the standard environmental record sources in 8.2.1, local records and/or additional federal, state, or tribal records shall be checked" when certain criteria are met.  (ASTM Standard § 8.2.3).

The ASTM permits the use of third-party vendors to collect the standard sources.  Namely, Section 7.5.2 provides "Information for the records review . . . may be provided by a number of parties including . . . third party vendors."  (ASTM § 7.5.2).  The Section goes on to provides that an environmental professional "is not required to verify independently the information provided but may rely on information provided unless he or she has actual knowledge that certain information is incorrect or unless it is obvious that certain information is incorrect based on other information obtained in the Phase I Environmental Site Assessment or otherwise actually known to the environmental professional."  (Phase I ESA, *Reliance*, ASTM § 7.5.2.1).  Finally, Section 8.1.8 provides that Standard Source information may be obtained from commercial services.  Information from such sources may be considered current if the source updates the information at least every 90 days.

The parties muster their expert opinions to explain why Natura's review did, or did not, follow these requirements.  For example, Plaintiffs' expert, Michael Pisarik, opines that that the ASTM standards "expects the environmental professional to review more than a list of information collected by a database company."  (ECF No. 70-10, PageID.2259).  Thus, Mr. Pisarik opines, a search of the database is insufficient to satisfy the records review requirements of Phase I ESAs, that environmental professionals should always confirm whether the information provided is accurate, and that the ASTM requires environmental professions to look beyond the standard sources that are returned through database searches.  Specifically, Mr. Pisarik contends the IEPA Document Explorer website is a standard source and that had Natura's environmental professional consulted it, she would have found the Rose Order regarding the northern adjoining property. Natura points out that Mr. Pisarik is merely painting a hypothetical.  His search was conducted during this litigation; there is no information that the Rose Order was on the IEPA Document Explorer when the Phase I ESAs were actually completed.  Moreover, Defendant's expert, Mr. Zovic, disagrees with Mr. Pisarik that the Rose Order should have been included in the scope of the assessment; he contends that court orders typically are not part of the required assessment package for Phase I ESAs.  He further opines that there are sufficient differences to render the northern adjoining property distinguishable.  For her part, Ms. Bersche was equivocal on whether she did consult the database, first commenting that she was "sure" that she did, and then admitting she didn't know.  (Bersche Dep. 62, ECF No. 70-3, PageID.2162).

The Court need not delve deeper into the minutia.  There is enough of a factual dispute that precludes summary judgment in Plaintiffs' favor, especially under the heightened standard that applies when the moving party bears the burden of persuasion at trial.  A rational jury could believe, from Plaintiffs' arguments and Mr. Pisarik's opinion, that Natura's records reviews were

not enough to comply with the ASTM.  A jury could reasonably conclude, however, from the ASTM and Natura's expert, Mr. Zovic, that the database review was sufficient to comply with the ASTM.  Either way, a jury will need to decide.

> ii.   *Interviews*

Plaintiffs' third claim of breach is that Natura failed to make "reasonable attempts" to interview various officials as required by the AAI, ASTM, and the contractual terms in the Natura proposal.

Section 11.5 of the ASTM provides that "a reasonable attempt shall be made to interview at least one staff member of any one of the following" (Interviews with State and/or Local Government Officials, *Who Should be Interviewed*, ASTM § 11.5).  The Standard lists four types of officials.

> 11.5.1.1    Local fire department that serves the *property*,
>
> 11.5.1.2    State and/or local health agency or local/regional office of state health agency serving the area in which the *property* is located,
>
> 11.5.1.3    State and/or local agency or local/regional office of state agency having jurisdiction over *hazardous waste* disposal or other environmental matters in the area in which the *property* is located, or
>
> 11.5.1.4    Local agencies responsible for the issuance of building permits or groundwater use permits that document the presence of AULs which may identify a recognized environmental condition in the area in which the *property* is located.

*Id.*

There appears to be no dispute that Ms. Bersche sent FOIA requests to several state and local agencies.  It further appears she was successful in communicating with the director of environmental health at the Christian County Health Department.  (ECF No. 72-13, PageID.2517).

The director responded to Ms. Bersche that it was unlikely his department had any records. (*Id.*). There is at least a question of fact whether this email correspondence satisfies the ASTM's requirement that the environmental professional make a reasonable attempt to interview a staff member of a local health agency (ASTM § 11.5.1.2). Thus, Plaintiffs are not entitled to summary judgment in their favor on this theory of breach.

iii.    <em>Identify RECs</em>

In its fourth and final claim for breach, Plaintiffs claim that Natura should have identified RECs even from the limited information it already had. In particular, Plaintiffs say that information disclosed an historical use of the property for greenhouses heated with steam. This information, Plaintiffs argue, should have alerted Natura to several RECs, namely, potential pesticides leaching into the soil, possible underground fuel tanks, and the presence of power plants made with asbestos containing materials.

Part of the problem, Plaintiffs maintain, is that the site reconnaissance was conducted not by Ms. Bersche, or any other environmental professional, but rather by Tom Robbins, someone that Ms. Bersche testified during her deposition did not know what to look for. (Bersche Dep. 13, ECF No. 70-3, PageID.2158). Plaintiffs contend this inspection did not comply with AAI or ASTM standards. The AAI, Plaintiffs point out, requires the entire inquiry to be conducted by an environmental professional or someone under the supervision or responsible charge of an environmental professional. 40 C.F.R. § 312.21(a). The ASTM goes on to provide that the site reconnaissance "shall be performed by a person possessing sufficient training and experience necessary to conduct the site reconnaissance . . . in accordance with this practice and having the ability to identify issues relevant to recognized environmental conditions in connection with the property. At a minimum, the environmental professional must be involved in planning the site

reconnaissance[.]" (Phase I Environmental Site Assessment; *Environmental Professional's Duties*, ASTM § 7.5.1).  Ms. Bersche certainly may testify from her lay perspective about her own perceptions of Mr. Robbins' abilities, but this does not satisfy Plaintiffs' heightened burden of demonstrating breach as a matter of law.  At a minimum the differing opinions between the two experts on these issues and others (including Plaintiffs' claim that Natura was required to identify pesticides and underground boilers as Business Environmental Risks) precludes summary judgment in Plaintiff's theory on this claim of breach.

       C.    *Damages*

Both sides spend some time in their briefing on damage issues.  Plaintiffs' brief focuses on causation.  Had the Phase I ESA identified RECS, Plaintiffs reason, there would have been a recommendation for a Phase II ESA that included things like soil borings, soil or ground water sampling, ground penetrating radar, and other investigations.  According to Mr. Pisarik, these investigations would have identified the construction debris beneath the surface of the Hickory Property.  And Hathaway Homes' CEO, Ms. Bell, avers that had Hathaway Homes known about the presence of asbestos containing materials, it would not have purchased the Hickory Property.  (Bell Decl. ¶ 4, ECF No. 70-8, PageID.2231).

Natura responds that there is a triable issue of fact on causation.  At a minimum, it says, Phase II recommendations are not mandated by the AAI or the ASTM, and the 2019 Proposal expressly stated "recommendations for Phase II ESA testing and remediation techniques are not provided within the scope of an ASTM performed assessment."  (ECF No. 72-11, PageID.2469).  Even if it had made recommendations, Natura says there are reasons to doubt that Plaintiffs would have followed through with additional testing.  For example, during her deposition Ms. Bell testified that she did not order additional testing for a separate project when debris was found

during excavation for a memory care unit located near the Hickory Property.  (Bell Dep. 53-55, ECF No. 76-3, PageID.2613-2616).   In this, Plaintiffs argue in reply that Natura is simply speculating.  S.E. Clark, for example, was not the developer on the memory care unit.  Natura's other arguments, Plaintiffs contend, are likewise conjecture.

A jury may or may not find Ms. Bell's testimony on causation credible.  At a minimum, Natura could ask Ms. Bell how she reacted when similar issues came up before in an effort to impeach her credibility on this point.  Accordingly, the issue of damages will need to move forward to trial.  The Court notes, however, that both sides agreed that should Plaintiffs prevail on a breach of contract claim at trial, any contractual damages will be limited by the Terms and Conditions in the contract documents.

D.   *Motions to Strike*

Plaintiffs' motion for summary judgment includes a rebuttal report from their expert Mr. Pisarik.  (ECF No. 70-10).  Natura moves to strike the report on the basis that it is not a true rebuttal report.  (ECF No. 82).  It says Mr. Pisarik's rebuttal report subtly corrects errors in the original report (by correcting words from possible and potential to "likely") to account for the definition of RECs.  And, it says, the rebuttal report contains new opinions that are not responsive to Natura's expert—namely the claim that Natura should have identified boiler rooms (and asbestos) as an REC.  For these reasons, Natura says, it included a declaration from its expert, Mr. Zovic, in its brief opposing Plaintiffs' motion to respond to what it sees as the new opinions from Plaintiffs' expert.  (ECF No. 76-10).  Plaintiffs, not unexpectedly, see things differently.  Mr. Pisarik's rebuttal opinion is entirely proper, they say, and it is Mr. Zovic, not Mr. Pisarik, who is providing new opinions.  Plaintiffs seek to strike Mr. Zovic's declaration for this reason.  (ECF No. 78).  Neither side meets their burden on the motions to strike.

Federal Rule of Civil Procedure 26(a)(2)(A) provides that "[i]n addition to the disclosures required by Rule 26(a)(1), a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under" Rules 702, 703, or 705.  The rule goes on to provide that "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report . . . if the witness is one retained or specially employed to provide expert testimony in the case or one whose duties as the party's employee regularly involve giving expert testimony." FED. R. CIV. P. 26(a)(2)(B).   Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  However, "if the evidence is intended solely to contradict or rebut evidence of the same subject matter identified by another party under Rule 26(a)(2)(B) or (C)" a different timeline applies. FED. R. CIV. P. 26(a)(2)(D)(ii). Moreover, "nothing in Rule 26 . . . precludes an expert from revising or further clarifying opinions, particularly in response to points raised in the presentation of a case." *McHugh v. Olympia Entertainment, Inc.*, 37 F. App'x 730, 735 (6th Cir. 2002).  The rule "must be read in light of its dual purposes of narrowing the issues and eliminating surprise.  [Courts] need to balance fairness to the opposing party with the realities of adversarial litigation." *Id.*  Based on this authority, courts have concluded that "Rule 26 should not be read so narrowly to prevent an expert witness at trial from (1) rebutting the analysis of another expert or (2) clarifying his or her opinion." *Hochstein v. Microsoft Corp.*, No. 04-cv-73071, 2006 WL 8066573, at *4 (E.D. Mich. Oct. 13, 2006).

Plaintiffs seek to strike the entirety of the Zovic declaration as an untimely "new" opinion. But beyond this assertion, Plaintiffs do not meaningfully argue what is new about the declaration. Indeed, much of it simply recites statements about Mr. Zovic's credentials and quotations from the

AAI or ASTM. Other portions appear to fall firmly into the camp of clarification. For the same reason, Natura's motion to strike fails to persuade the Court that portions of Mr. Pisarik's rebuttal report should be stricken. Natura's concern that Mr. Pisarik's language morphed to fit with the language of RECs, along with Plaintiff's concern about Mr. Zovic's opinion can all be addressed in cross examination. Accordingly, the Court denies the two motions to strike.

### 2. *Tort Claims*

Both sides seek summary judgment in their favor on the two tort claims in the Amended Complaint. Count 2 of the Amended Complaint asserts that Natura was negligent in failing to perform a proper Phase I ASTM. Plaintiffs say that Natura owed Plaintiffs a duty to perform the Phase I ESA with the requisite professional skill and in accordance with the AAI and the ASTM Standards. In Count 3 Plaintiffs allege that Natura's president, Mr. Gillette, led S.E. Clark to believe that he was the "go to guy" for the Phase I reviews, and that he would be directly involved in performing the work. At no time did Mr. Gillette correct the misimpression that he was qualified to perform Phase I ESAs.

Natura disagrees and in their motion it seeks to dismiss the tort claims under the economic loss doctrine and the rule set out in *Hart v. Ludwig,* 347 Mich. 559, 79 N.W.2d 895 (1956). Furthermore, Natura argues that Plaintiffs' negligent misrepresentation claim fails as a matter of law and that it is entitled to summary judgment in its favor on this claim. For the reasons that follow, the Court agrees with Natura and grants its motion with respect to the tort theories.

### A. *Plaintiffs Fail to Establish a Breach of Duty Separate and Distinct from the Existing Contract.*

The economic loss doctrine is a judicially created limitation on tort actions that seek to recover economic damages resulting from commercial transactions. *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002) (citing Frumer &

Friedman, Products Liability, § 13.11[1] (2000)). The doctrine is essential to avoid "contract law . . . drown[ing] in a sea of tort." *East River S.S. Corp. v. Transmerica Delaval, Inc.*, 476 U.S. 858, 866 (1986). Generally, the doctrine provides that economic losses relating to commercial transactions are not recoverable in tort. The economic loss doctrine has traditionally been applied in the context of claims over defective products, which involve contracts for the sale of goods under the Uniform Commercial Code. But many jurisdictions have expressly expanded the doctrine to cases involving contracts for services. *See Quest Diagnostics, Inc. v. MCI WordCom, Inc.* 254 Mich. App. 372 379 n.6 (Mich. Ct. App. 2002) (citing *In re StarLink Corn Prods. Liability Litigation*, 212 F. Supp. 2d 828, 839 n.6 (N.D. Ill., 2002)). The Michigan Supreme Court has not yet ruled on whether the economic loss doctrine applies in the context of contracts for services. *See Farm Bureau Mut. Ins. Co. v. Borkholder Buildings & Supply, LLC*, No. 1:14–cv–1118, 2015 WL 5682729, at *3 (W.D. Mich. Sept. 25, 2015) ("The [Michigan Supreme Court] has yet to provide clear guidance on the determinative factors for applying the economic loss doctrine.").

This Court has previously noted the theoretical underpinnings of the doctrine apply to contracts of both types. *IBX Jets, LLC v. Paradigm Jet Mgmt., Inc*., No. 1:16-CV-00229-RJJ, 2017 WL 3168930, at *5 (W.D. Mich. June 9, 2017). Thus, the Court held:

> This Court holds that where, as here, the damages are allegedly sustained by commercial businesses, the contracts were entered into for commercial purposes, the claimed losses are economic in nature, and the facts underlying the parties' tort and contract claims are not separate and distinct, the Michigan Supreme Court would likely use the economic loss doctrine to bar the tort claims.

*Id.* This holding recognizes that at least some contracts for services are similar in all material respects to contracts for the sale of commodity goods. And, indeed, the contracts here for a Phase I ESA are like that. A Phase I ESA is a commodity service product. The comparatively low price—$2,100 here, with a $1,100 update fee—reflects that. So does the use in the contract

documents of standard terms and conditions found in many standard U.C.C. contracts.  But in this case there is more: the parties themselves expressly decided to contract for limited damages, capped at either the total fees payable to Natura (the original version) or the limits of Natura's coverage (the second version).  In both cases, the parties actually used the underlying theory of the economic loss doctrine to explain themselves: "In recognition of the relative risks, rewards and benefits of the project to both the Client and NAC, the risks have been allocated such that the Client agrees [to the damage limit]."  (ECF No. 72-11, PageID.2470).  Moreover, the parties go on to agree that the limit applies broadly to "negligence, professional errors or omissions, strict liability, and breach of contract or warranty."  (*Id.*).

To be sure, district courts applying their state's economic loss rules have not always agreed. For example, in *Hawaii Motorsports Inv., Inc. v. Clayton Group Services, Inc.*, 693 F. Supp. 2d 1192 (D. Haw. 2010), the district court found that Hawaii's economic loss rule did not preclude a plaintiff alleging breach of contract based on an allegedly inaccurate Phase I ESA from also bringing a professional negligence claim.   Similarly in *Neumann v. Carlson Environmental, Inc.*, 429 F. Supp. 2d 946 (N.D. Ill. 2006), the district court found that Illinois law on the economic loss doctrine did not preclude a plaintiff from moving forward on both contractual and professional negligence theories against an environmental consultant on the basis that the consultant's "particularized knowledge and expertise gave rise to a duty independent of its contract with plaintiffs (its professional duty to provide an accurate environmental assessment)."  *Id.* at 953.  But in *Maine Rubber Intern. v. Environmental Management Group, Inc.*, 298 F. Supp. 2d 133 (D. Me. 2004), the court determined that Maine would apply its economic loss doctrine to professional services contracts, including to Phase I ESAs.  The court reasoned that the parties in the case "were two commercial entities able to bargain over the terms of their agreement, and they entered into a

24

written contract to govern their relationship.  There was no risk of harm either to people or to other property.  The critical issue here . . . is value and quality of what was purchased."  *Id.* at 137-138. The equal bargaining power between the two commercial entities, the court further noted, was "quite different" than other situations where professional tort claims were allowed to proceed, such as between a lawyer and her client, or where a fiduciary duty existed (such as an accountant / client relationship); or some sort of extra-contractual relationship involving a close relationship of trust or confidence that "would compel" the plaintiff to rely heavily on the judgments of the consultant transcending contractual obligations.  At bottom, the consultant "had no mandate to observe a level of professional competence that existed independently or outside the contractual language."  *Id.* at 138 n.7.  For reasons just recited, the Court believes the Michigan Supreme Court would use apply the same reasoning to apply Michigan's economic loss doctrine to an environmental consultant's professional services contract for Phase I ESAs at least when the parties' written contract includes the express damage limiting language here.  The Court adheres to its decision in *IBX Jets* and concludes that Plaintiffs' two tort claims are barred under the economic loss doctrine.

But even if the economic loss doctrine does not apply here, Plaintiffs' negligence claims would be barred under the rule set out in *Hart.*  Acknowledging that the line between contract and tort actions was sometimes unclear, the court in that case enunciated the following principle:

> When the cause of action arises merely from a breach of promise, the action is in contract. The action of tort has for its foundation the negligence of the defendant, and this means more than a mere breach of a promise. Otherwise, the failure to meet a note or any other promise to pay money, would sustain a suit in tort for negligence, and thus the promissor be made liable for all the consequential damages arising from such failure. As a general rule, there must be some active negligence or misfeasance to support tort. There must be some breach of duty distinct from breach of contract.

*Hart*, 347 Mich. at 563.

The question that arises, then, is whether Plaintiffs have alleged a violation of a legal duty separate and distinct from the contractual obligation in the 2019 Natura Proposal. They have not. To be sure, as Plaintiffs point out, courts have held that professional malpractice typically presumes the presence of a contract between the client and the professional. *See, e.g.*, *Broz v. Plante & Moran*, *PLLC*, 331 Mich. App. 39, 50 (Mich. Ct. App. 2021). But that does not obfuscate the rule in *Hart* that there must be a breach of duty distinct from a breach of contract. And here the duties listed in the Amended Complaint in support of Plaintiffs' tort claims merely restate the theories of breach from the contract claim. This much is clear from a comparison of the allegations in the Amended Complaint. For example, Plaintiffs allege in paragraph 40 of the Amended Complaint (relating to breach of contract) and paragraph 50 (relating to professional malpractice) that Natura did not fulfill its obligations to perform an AAI and ASTM complaint Phase I ESA. Similarly Paragraphs 41 and 51 both allege that Natura failed to do "sufficient research;" Paragraphs 42 and 52 both allege that Natura failed to review IEPA and local agency regulatory files; and Paragraphs 43 and 53 both allege that Natura failed to interview regulatory officials. Nothing here demonstrates a duty independent of those the parties contracted to perform.

The cases referenced by Plaintiffs are readily distinguished. In *Poly-Flex Const., Inc. v. Neyer, Tiseo & Hindo, Ltd.*, 582 F. Supp. 2d 892 (W.D. Mich. 2008) the defense argued that the tort claims were barred by, in part, because there was no duty independent of the contract. The court's decision, however, involved one of timeliness, and it expressly did not reach the issue. *Id.* at 903 n.5. *Broz v. Plante & Moran, PLLC*, 331 Mich. App. 3d (2020) and *Clark v. Dalman*, 379 Mich. 251 (1967) did not discuss *Hart* at all. In the Court's view, *Hart* remains good law.

Plaintiffs' final argument is that Natura voluntarily assumed a separate duty when it stated in its completed assessment that "no further investigation is recommended at this time." (ECF No.

26

62-2, PageID.1481).  After all, Plaintiffs say, Natura's proposals excluded "recommendations for

Phase II ESA testing and remediation techniques" from the scope of its assessments.  The Court

fails to see a separate voluntarily assumed duty here.  In *Just us Four, LLC v. Villa Environmental*

*Consultants, Inc.*, No. 300215, 2011 WL 6378814 (Mich. Ct. App. Dec. 20, 2011) an investment

company sought to purchase property to hold for future development as a casino.   Before

purchasing the property, the investor—Debra Weck—sought a Phase I ESA from an

environmental consultant that included a 'Wetland Review."   With respect to wetlands, the

completed Phase I report indicated there was a creek that "intercepts" the property.  Later, the

consultant advised Weck that "you're good to go" and "I think you'll be fine," and the investment

company bought the property.

When the company sought to turn around and sell the property to develop it as a casino a

second study was done that found there were 15 acres of protected wetlands.   Weck and the

investment company filed suit against the consultant for breach of contract and negligence, the

latter based on the consultant's representations.   As to the negligence claim, the court found that

the investor had failed to demonstrate any breach of a duty that was separate and distinct from the

contractual duties:

> Here, plaintiff alleges that [the consultant] was negligent in
> communicating the results of the wetland review to Weck and in
> answering her inquiries about the property by assuring her that she
> was "good to go" and that he thought she would "be fine."
> Defendant contracted to advise plaintiff whether there was the
> potential for wetlands on the property.  Plainly, all of plaintiff's
> claims arise from this contractual obligation; defendant had no duty
> to assess the property or to communicate with plaintiff and Weck
> about its condition other than as imposed by the contract.  Therefore,
> while plaintiff's allegations arguably make out a claim for negligent
> performance of the contract, plaintiff does not allege a violation of
> an independent legal duty distinct from the duties arising out of the
> contractual relationship.

*Id.* at \*6 (internal quotation marks and ellipses omitted).

The same holds true here.  Natura contracted to perform a Phase I ESA of the Hickory Property.  It prepared the report and concluded there were no RECs on the property.  That's what Plaintiffs agreed to buy for $2,100.  With this in hand, Plaintiffs could qualify for the tax credits and decided to move forward by purchasing the property.  All the claims here arise from whether Natura prepared the report as required by the contract.  There is no separate or voluntarily assumed duty beyond that.

### B. Natura is also Entitled to Summary Judgment on the Negligent Misrepresentation Claim on the Merits.

Natura is also entitled to summary judgment in its favor on Plaintiffs' negligent misrepresentation claim in Count 3 because the record does not raise a triable fact issue on the claim.  Plaintiffs allege in Count 3 of the Amended Complaint that Natura's president, Mr. Gillette, led S.E. Clark to believe that he was the "go to guy" for the Phase I reviews, and that he would be directly involved in performing the work.  At no time, they say, did Mr. Gillette correct S.E. Clark's impression that he was qualified to perform Phase I ESAs.

"A claim for negligent misrepresentation requires plaintiff to prove that a party justifiably relied to his detriment on information prepared without reasonable care by one who owed the relying party a duty of care." *Fejedelem v. Kasco*, 269 Mich. App. 499, 502 (2006) (internal quotation marks omitted).  "The elements of the tort of negligent misrepresentation are: (1) the defendant made a material misrepresentation; (2) the representation was false; (3) the defendant was negligent in making the misrepresentation, i.e., the defendant breached a business or professional duty of care to provide accurate information to those who employ him; and (4) the plaintiff suffered damages as a result." *Cleveland Indians Baseball Co.*, *L.P. v. New Hampshire*, 727 F.3d 633, 641 (6th Cir. 2013) (citing *Law Offices of Lawrence J. Stockler P.C. v. Rose*, 174

Mich. App. 14, 436, N.W.2d 70, 81 (1989)).  "The tort of negligent misrepresentation in Michigan imposes a duty in favor of all those third parties who defendant knows and should reasonably foresee will rely on the information in question." *Molecular Tech. Corp. v. Valentine*, 925 F.2d 910, 919 (6th Cir. 1991).

Plaintiffs' evidentiary submissions do not satisfy this framework.  Indeed, Plaintiffs do not identify evidence of an actual misrepresentation.  Instead, the basic theory is two-fold failure to correct a misimpression.  First, Mr. Gillette, at least indirectly, led S.E. Clark to believe he was an environmental professional, or at least someone competent to perform environmental work himself.  Mr. Gillette reinforced this misimpression when he signed the Phase I ESA executive summaries as a reviewer under a line that stated the Phase I ESA had been reviewed for accuracy and completeness.  The only reasonable takeaway from this, Plaintiffs say, is that a client would believe Mr. Gillette knew what he was talking about and represented he had reviewed the Phase I ESAs as an environmental professional.  Thus, the crux of Plaintiffs' theory is not that Mr. Gillette made a material misrepresentation, but rather that he omitted a material consideration in his discussions with S.E. Clark.  That is the only possible theory available on the evidentiary record because there is no evidence of any actual misrepresentation.[7]

It is true that a court in the Eastern District has found that the tort of negligent misrepresentation in Michigan can include omissions.  *See Burket v. Hyman Lippitt, P.C.*, 560 F.Supp.2d 571, 597 (E.D. Mich. 2008) (Duggan, J.), *vacated in part on other grounds* 2008 WL 2478308 (E.D. Mich. June 17, 2008).  The Eastern District decision, which involved the omission

---

[7] To the extent that Plaintiffs argue Mr. Gillette made a demonstrably false statement by signing his name as a "reviewer."  The Court disagrees.  At most, Mr. Gillette represented he had reviewed the Phase I ESA along with the environmental professional.  Nothing here demonstrates a false representation.

of certain information from securities subscription agreements, based its decision based on the Michigan Supreme Court's decision in *Williams v. Polgar*, 391 Mich. 6 (1974) a case involving the omission of a record deed in a chain of title abstract. This case does not involve securities, real estate, or fiduciary duties and *Burket* is not binding on this Court in any event.

Plaintiffs' theory here more closely sounds in fraud. Even then, those cases involving silent fraud require a legal duty for a defendant to make a disclosure. *Titan Ins. Co. v. Hyten*, 491 Mich. 547 (2012) ("courts have not hesitated to sustain recoveries where the truth has been suppressed with the intent to defraud"). *Nowicki v. Podgorski*, 359 Mich. 18 (1960); *Barclae v. Zarb*, 300 Mich. App. 455 (2013). In *Barclae*, the Michigan Court of Appeals discussed the silent fraud tort as follows:

> In order to maintain an action for silent fraud, "the plaintiff must show that the defendant suppressed the truth with the intent to defraud the plaintiff and that the defendant had a legal or equitable duty of disclosure. A plaintiff cannot merely prove that the defendant failed to disclose something; instead, a plaintiff must show some type of representation by words or actions that was false or misleading and was intended to deceive." *Lucas v. Awaad*, 299 Mich. App. 345, 363–364, 830 N.W.2d 141 (2013).

*Barclae*, 300 Mich. App. at 477. Plaintiffs have not demonstrated that Mr. Gillette owed them a duty to reveal that he was not an environmental professional. Nor have they established a triable issue that his failure to disclose that he was not an environmental professional or competent to review Phase I ESAs for substance was calculated to defraud Plaintiffs. Thus, Plaintiffs' claim fails under a silent fraud framework.

But even if the negligent misrepresentation framework applied to the alleged omissions, Natura still would be entitled to summary judgment because Plaintiffs have not established a triable issue on damages caused by the alleged negligent misrepresentation or omission. As Natura points out, the officers of Hathaway Homes general and limited partners barely reviewed the Phase

I ESAs, much less were familiar with Mr. Gillette.  Both Ms. Bell and Mr. Race testified that they did not become familiar with Mr. Gillette until after Hathaway Homes acquired the property.  Ms. Bell testified she first heard Mr. Gillette's name after S.E. Clark told her about the materials that were found after excavation at the Hickory Site had begun.  (Bell Dep. 63, ECF No. 72-2, PageID.2312).  Mr. Race, Hathaway Homes' CFO, first heard Mr. Gillette's name a month before his deposition.  (Race Dep. 58, ECF No. 72-7, PageID.2413).

S.E. Clark's vice president, Mr. Joseph's was deposed as a Rule 30(b)(6) representative. When asked what was important about Mr. Gillette's signature on the completed Phase I ESA, Mr. Joseph responded that what was important to S.E. Clark was that the Phase I ESA met the ASTM and IHDA standards.  He said "I really don't care" if Mr. Gillette needed to review the Phase I ESA to confirm the standards.  What mattered to him was that the standards were met.  (Joseph Dep. 63, ECF No. 72-6, PageID.2391).  Mr. Joseph testified the Phase I "needed to be reviewed and signed but . . . we were not insistent that Nate [Gillette]" perform the review.  (*Id.* at 63-64). He confirmed that "as long as an environmental professional signed the report, S.E. Clark was comfortable."  (*Id.* at 64).  These sworn admissions eliminate any triable issue on reliance and damages.

Accordingly, the defense is entitled to summary judgment on its negligent misrepresentation claim.

**CONCLUSION**

**ACCORDINGLY, IT IS ORDERED** that Plaintiffs' Summary Judgment (ECF No. 69) is **DENIED.**

**IT IS FURTHER ORDERED** that Defendant Natura's Motion for Summary Judgment (ECF No. 71) is **GRANTED** with respect to Counts 2 and 3 of the Amended Complaint.

**IT IS FURTHER ORDERED** that the two motions to strike (ECF Nos. 78 and 82) are

**DENIED.**

This case will go forward on Count 1 only.

Dated:   <u>April 24, 2023</u>        <u>/s/ Robert J. Jonker</u>
                                            ROBERT J. JONKER
                                            UNITED STATES DISTRICT JUDGE